**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                           CR. No.  19-557 JCH

ANA SARAHI VAZQUEZ-LOPEZ,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant's Motion to Suppress Statements and Evidence* [Doc. 26]. On November 19, 2019, the Court held an evidentiary hearing on the motion at which Defendant was present. Based on the evidence presented at the hearing, the briefs filed by the parties [Docs. 26, 36, and 39], and the arguments of counsel, the Court concludes that the motion to suppress should be denied.

## FACTS

On February 1, 2019, DEA Special Agent Jarrell Perry and DEA Task Force Officer Jordan Grady were at the Greyhound bus station in Albuquerque to meet the eastbound bus from Phoenix. When the bus arrived, all the passengers got off so that the bus could be serviced. As was their standard practice, before any of the passengers could re-board the bus, Perry and Grady got on the bus, Perry standing at the rear and Grady at the front. Both wore plain clothes and carried concealed firearms. Perry spoke with passengers on the bus while Grady observed.

Perry interacted with various passengers, identifying himself as a "police officer checking the bus" as he did so. His tone was polite. When Perry reached Defendant's row, he found her seated next

to the window, with another woman seated in the aisle seat beside her. Standing slightly behind them in order to not block their exit, he introduced himself and asked to speak to them. The other woman agreed; Defendant said nothing audible but nodded her head up and down. Taking this as assent, Perry asked if the women were traveling together, and the other woman said that they were not. So, Perry asked Defendant directly if he could speak with her, and she nodded silently. He stood partly in the aisle, just behind the women's seats.

Perry asked each of the women where they were headed. Defendant said she was going to Oklahoma City. Perry asked where she was coming from and what was bringing her to Oklahoma. Defendant said that she was going to Oklahoma to visit family for a week; he did not ask the same thing of the woman in the aisle seat. Perry asked to see both women's tickets, and both handed their tickets to him. Perry saw that Defendant's ticket listed a destination of Little Rock, Arkansas. After a few seconds, Perry handed Defendant's ticket back to her.

Perry asked both women if they had any luggage on the bus, and both responded that they did. The woman in the aisle seat indicated that all of her luggage was in the compartment underneath the bus. Defendant identified as her luggage a brown bag located between her feet. Perry then asked Defendant if a blue bag on which the brown bag was resting was also hers. The blue bag was also between Defendant's feet, which were touching it. Defendant said that it was not hers. Twice more, Perry asked Defendant if the blue bag was hers, and both times she said that it was not. As a result, Perry asked the other woman to hand him the blue bag. She picked it up and noted that it was heavy, then handed it to Perry. He also noticed that it was heavy and had no name tag.

Defendant consented to a search of her brown bag. It contained clothing but no contraband. Perry then asked to check both women's identification. They gave him their documents, and after looking at them Perry handed them back. Perry once again asked Defendant if the blue bag was hers.

She said it was not and that "it was there" when she arrived; she did not care what happened to it because it was not hers. Perry then took the blue bag and asked each passenger on the bus if it belonged to them. However, no one claimed it. Concluding that the blue bag was abandoned, Perry took it off the bus and opened it outside of Defendant's view. He found women's clothing and four large, plastic-wrapped bundles consistent with illegal narcotics. He also found a California ID card in the name of Rebecca Mitra Parsa.

At this point, Perry initiated a second encounter with Defendant. Suspecting that the blue bag belonged to her, Perry re-boarded the bus and asked Defendant if she would be willing to speak to him off the bus. He said, "Would that be OK with you?" Defendant agreed to get off the bus. She told Perry (now joined by Grady) that she was going to Oklahoma to visit her aunties. Perry asked for the aunt's name, and Defendant said "She's not really my auntie," but rather a family friend named Pamela Vazquez. Perry asked if this person was in Oklahoma City, and Defendant said that she was. Perry asked Defendant for a phone number of this person in order to try to confirm her story. Perry asked the purpose of Defendant's trip, and she said that "somebody got sick from the family." In a confusing exchange with Perry, at first Defendant did not identify the sick person. She said that she had purchased the ticket herself, and that she had been planning the trip for awhile. She clarified that Pamela Vazquez was going to pick her up in Oklahoma City, and that the sick relative was her aunt, Guadalupe Salabia, who lives in Oklahoma City. Defendant said she would be visiting for a week.

Perry asked Defendant to unzip her jacket so that he could see if she had anything around her waist. Seeing nothing there, Perry asked to see her ID again. Defendant handed it to Perry, who passed it to Grady. Perry said that Defendant didn't have very many clothes in her bag and asked her what she planned to do for clothing. Defendant responded, "Buy some." Perry asked Grady to check Defendant's criminal history by calling "EPIC" (El Paso Intelligence Center). Perry then asked to see Defendant's

ticket again. After looking at it, Perry asked her if she had her ticket reissued or changed. She said that she had not. Once again, Perry asked her, "Your final destination is Oklahoma City, right?" Then Defendant said for the first time that she was actually going to Little Rock (which was the destination printed on her ticket). Perry asked to see the ID one more time, and then asked her about having the brown bag sitting on top of the unclaimed blue bag. Defendant said that the blue bag had been on the bus when she boarded, but she could not recall in what city she had first noticed the blue bag. Perry tried calling the phone number Defendant gave him for Pamela Vazquez, but no one answered. Perry asked Defendant to confirm the name of the aunt who was sick, Guadalupe Salabia. Defendant first said that her aunt lived in Oklahoma City, then said she lived in Little Rock. She said that she had been confused because she had Oklahoma City on her mind. Perry asked Defendant how she planned to get from Oklahoma City to Little Rock, and she said that she was going to take another bus. Perry asked Defendant for permission to search the brown bag again, which she granted. Perry returned Defendant's ID, bag, and ticket and told her that she was free to get back on the bus or "hang out here, whichever you wish to do."[1] Defendant said, "I could wait."

Shortly thereafter, Perry arrested Defendant and transported her to the DEA office where she was processed. During her interrogation, she made self-incriminating statements.

## DISCUSSION

**I.    Initial Encounter on the Bus**

Defendant argues that her initial conversation with Perry on the bus was not consensual, but rather that a reasonable person would not feel free to leave during that encounter. She points to the fact

---

[1] The recording of the second encounter shows that Perry asked for Defendant's ID at approximately the 3:25 mark and returned it to her at approximately 8:40. Therefore, either Perry or Grady possessed it for a little over five minutes.

that she did not audibly consent to talk to Perry, Perry was standing in the aisle, and Grady was near the front of the bus. She contends that Perry did not state why he was "checking the bus." She contends that she did not feel free to leave or to otherwise terminate the encounter within the cramped confines of the bus, where she was "virtually trapped in the window seat." She contends that Perry "knew the women were not travelling together, and he exploited [Defendant's] position in order to force her 'consent' to speak with him." Doc. 26 at 9. Under Defendant's theory, her abandonment of the blue bag was involuntary due to this improper seizure, and therefore Perry's search of the blue bag was unlawful.

In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). "[T]he test allows officers to make inquiries so long as they don't throw their official weight around unduly." *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). There are no per se rules that govern this inquiry; "[r]ather, every case turns on the totality of the circumstances presented." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc)).

The Tenth Circuit has enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Lopez*, 443 F.3d at 1284 (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). "Although no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (quoting *Fuerschbach v. Sw. Airlines Co*., 439 F.3d 1197, 1203 (10th Cir. 2006)).

In this case, the encounter between Perry and Defendant took place on a Greyhound bus within view and earshot of other passengers. Perry did not touch Defendant during the encounter or physically hover over her; instead, he stood in the aisleway just behind her row of seats so as not to block her exit from the bus. Both Perry and Grady, who was standing some distance away, wore plain clothes and displayed no weapons. There is no evidence to suggest that Defendant even knew that Grady was working with Perry at this point in their interactions. The recording of the encounter shows that Perry used the same neutral tone when speaking to Defendant that he used while speaking to all the other passengers. Perry asked permission to speak with Defendant before asking her questions, and she nodded her agreement. Finally, Perry did not advise Defendant that she had the right to refuse to speak with him. Based on the foregoing, the Court concludes that under the totality of the circumstances Perry's initial encounter with Defendant was consensual. Nothing in the audio recording or in Perry's words or actions conveys anything that would lead a reasonable person to feel coerced into answering his questions.

Although Defendant argues that she was trapped in a window seat and therefore unable to escape Agent Perry, this argument does not hold up under the evidence, which shows that he did not block her egress from her seat into the aisle. Further, it was Defendant who chose to sit by the window. To the extent that it may be harder to exit a window seat than an aisle seat, that difficulty may not be laid at Perry's feet. As the Tenth Circuit has noted, when a defendant's "freedom of movement was the natural result of his choice of transportation and seat assignment" and not the actions of law

enforcement, it does not result in impermissible coercion. *U.S. v. Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000). There is no evidence that Perry's conduct or position on the bus conveyed the message that compliance with his requests was required. Thus, Defendant's conversation with Perry was voluntary.

Furthermore, Defendant's abandonment of the blue bag was voluntary. The Fourth Amendment is not implicated when police search property that has been abandoned. *See United States v. Juszczyk*, 844 F.3d 1213, 1213 (10th Cir. 2017). Abandonment occurs if either (1) the owner subjectively intended to relinquish ownership of the property or (2) the owner lacks an objectively reasonable expectation of privacy in the property. *See id.* at 1214; *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997). The owner's abandonment must be voluntary, and abandonment cannot be voluntary when it results from a violation of the Fourth Amendment. *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1187 (10th Cir. 2006). The Court has concluded that the initial interaction between Perry and Defendant was consensual. As a result, Defendant's denial of ownership of the blue bag and her actions in turning the bag over to Perry—which constitutes abandonment—were also voluntary.

## II.    Second Encounter

The argument regarding Perry's second encounter with Defendant has two parts. First, Defendant argues that Perry seized her when he spoke to her a second time and asked her if she would be willing to speak to him off the bus. He said, "Would that be OK with you?" Then Defendant agreed to do so. Defendant appears to rely upon the same facts she relied upon to argue that the first encounter was not consensual—that Grady was in the front of the bus, that she was "trapped" in a window seat, that Perry was standing in the aisle—to show that her consent to get off the bus was involuntarily given. However, for the same reasons previously discussed in Part I, *supra*, the Court concludes that the very brief second interaction on the bus between Perry and Defendant also was a consensual encounter. His

tone was polite, there was no show of weapon or use of physical control, he did not block her ability to leave her seat, and the very brief interaction occurred in the public space of the bus. Furthermore, Defendant could have refused to leave the bus and thereby terminate the encounter, but she did not do so. Thus, it was voluntary.

Second, Defendant argues that even if she was not seized when Perry asked her if she would agree to talk with him off the bus, she was seized a few moments later when Perry asked to see her ID for a second time and instead of immediately returning it to her, gave it to Grady to run through EPIC. An individual has been "seized" for Fourth Amendment purposes when a reasonable person in the individual's position would not feel free to terminate her encounter with the police and leave. *See Halley v. Huckaby*, 902 F.3d 1136, 1145 (10th Cir. 2018). Such a seizure must be supported by probable cause. *Id.* On the other hand, police officers are permitted to pose questions, ask for identification, and request consent to search even when they have no particular reason to suspect an individual has violated the law. *Id.* This type of seizure, usually known as an investigative detention, must be assessed under the totality of the circumstances and from the perspective of the objective, reasonable person. *See Jones v. Hunt*, 410 F.3d 1221, 1225-26 (10th Cir. 2005).

Here, Defendant voluntarily agreed to continue her encounter with Perry off the bus. The question is whether that consensual encounter became a seizure when Perry asked for her identification and did not return it to her until a little more than five minutes later. Defendant cites *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995), in which the court stated that "what began as a consensual encounter quickly became an investigative detention once the agents received Mr. Lambert's driver's license and did not return it to him." This is because as a practical matter, an individual is not free to go while a law enforcement officer is holding their identification. *Id.* In *Lambert*, the agents held the defendant's identification for twenty to twenty-five minutes at an airport while conducting their

investigation, thereby seizing him because a reasonable person would not feel free to leave under those circumstances. The Government attempts to distinguish *Lambert* by arguing that Perry and Grady held Defendant's ID for only a few minutes before returning it to her. The Court disagrees with the Government. For over five minutes, Defendant was without her identification, and for some portion of that, she was also without her bus ticket. No reasonable person would have felt free to leave during that time, and therefore Defendant was detained.

However, the Court does agree with the Government that this was an investigative detention supported by reasonable suspicion under the "totality of the circumstances" test. Investigative detentions are Fourth Amendment seizures of limited scope and duration. *See United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012). In determining whether reasonable suspicion exists, a court must look at the totality of the circumstances. *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). Further, a court "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). In fact, reasonable suspicion may exist even where "it is more likely than not that the individual is not involved in any illegality." *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004). Reasonable suspicion requires only "some minimal level of objective justification." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (internal quotation marks omitted).

In this case, Defendant and Perry's consensual encounter yielded adequate facts to support reasonable suspicion. First, Defendant said numerous times that she was going to Oklahoma, yet her ticket said that her destination was Little Rock, Arkansas. Agent Perry testified that in his experience, lying about one's destination was a red flag for someone carrying illegal narcotics. Second, Defendant was seated with the blue bag between her legs with her feet actually touching the bag and her other bag sitting on top of it. To any reasonable observer this behavior would suggest ownership or possession of the blue bag. Third, Defendant laughed nervously when asked if she was sure that the blue bag was not

hers.  Fourth, no one else on the bus claimed the bag. Fifth, the blue bag contained bundles that, based on Perry's experience, looked like bundles of illegal narcotics. Finally, the bundles were wrapped in women's clothing. The parties disagree as to whether or not the clothing in the blue bag was similar enough to the clothing in Defendant's brown bag to suggest common ownership. However, the Court concludes that the clothing was similar enough in size and brand such that it was reasonable for Perry to infer that they belonged to the same person. All of the foregoing, considered under the totality of the circumstances test, is more than enough to support reasonable suspicion to detain Defendant.

This conclusion is not altered by the fact that the blue bag contained a California driver's license for a woman named Rebecca Mitra Parsa, not the Defendant. Perry looked for someone on the bus who looked like Parsa or matched her description, but he found no such person. Although the presence of this driver's license could suggest that the blue bag belonged to someone other than Defendant, it does not outweigh all of the other factors discussed above under the totality of the circumstances.

## III.    Arrest of Defendant

Defendant argues that Perry arrested her without probable cause. Defendant suggests that Perry unfairly zeroed in on her as the probable owner of the blue bag without subjecting the woman next to her to the same scrutiny. She also suggests that her explanation of how the blue bag came to be under her feet was sufficient and credible: she provided Perry with a phone number for the woman who was going to pick her up from the bus, and the search of her name on EPIC yielded no criminal history. Defendant further argues that Oklahoma City was a stopover on her route to Little Rock and that she had been focused on that, which explained the reason for her confusion when answering questions about her travel plans. Finally, she points to the fact that there was another woman's ID found inside the blue bag.

Probable cause exists "when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed" and that the person or property was involved in the crime. *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) (quoting *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004)). "Probable cause is not a precise quantum of evidence." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). Rather, the relevant question is whether there was a "substantial probability"—"something 'more than a bare suspicion' "— that the person or property was involved in a crime. *Id.* (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

The Court concludes that Perry did have probable cause to believe that Defendant committed a crime. First, the evidence at the hearing showed that Defendant was seated with the blue bag in a manner that suggested possession—not only with the bag directly beneath her feet, but also with one or both of her feet actually touching it. Further, Defendant had placed her brown bag on top of the blue bag. Defendant's actions would suggest to any objective observer that Defendant owned the blue bag because people do not typically behave in such a manner toward luggage that does not belong to them. Second, Defendant said that the blue bag was already on the bus when she boarded it, but she could not say which city she was in when she first saw it. Third, the blue bag contained bundles that appeared to be illegal narcotics. Fourth, those bundles were wrapped in women's clothing that was not too dissimilar from the clothing found in Defendant's brown bag. Fifth, during their consensual encounter, Defendant gave Perry evasive, inconsistent, and unclear answers to questions about her ultimate destination. At first she said that she was going to Oklahoma City, and then at the end of the investigative detention she said her destination was Little Rock. Sixth, Defendant gave vague, inconsistent and confusing answers about who she was visiting, who was picking her up, which family member was sick, and what their

illness was. Perry attempted to confirm Defendant's story with the phone number she provided but was unable to do so. Finally, Perry credibly testified that Defendant acted in a nervous manner.

Based on these factors, the Court concludes that Perry had probable cause to believe that the blue bag contained illegal narcotics and that it belonged to Defendant, and therefore that she had committed a crime. As a result, her arrest did not run afoul of the Fourth Amendment.

For all of the foregoing reasons,

**IT IS THEREFORE ORDERED** that *Defendant's Motion to Suppress Statements and Evidence* [Doc. 26] is **DENIED**.


_____
**UNITED STATES DISTRICT JUDGE**